# In the United States Court of Federal Claims

|  |  |
|---|---|
| ADIA HOLDINGS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 23-623C |
| v. ) | (Filed: March 19, 2024) |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

Chase M. Stern and Jonathan M. Rotter, Glancy Prongay & Murray LLP, Los Angeles, CA; Andrew W. Lamb and Stephen Weisbrod, Weisbrod Matteis & Copley, Washington, DC; Josh S. Stambaugh and John D. Maata, Frost LLP, Los Angeles, CA; and Jeffrey Lee Costell, Costell & Adelson Law Corporation, Santa Monica, CA, for Plaintiff.

Rebecca S. Kruser, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant, with whom were William J. Grimaldi, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Principal Deputy Assistant Attorney General.

**OPINION AND ORDER**

**KAPLAN, Chief Judge.**

In the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ("ARPA" or "the Act"), Congress created the Restaurant Revitalization Fund ("RRF" or "the Fund") to provide assistance to restaurants and similar establishments impacted by the COVID-19 pandemic. See id. § 5003(b), codified at 15 U.S.C. § 9009c(b). The plaintiff in this breach of contract case, Adia Holdings, Inc. ("Adia"), applied for a grant from the RRF as an ARPA priority applicant, a privilege enjoyed by businesses that were majority-owned by women, veterans, and/or socially and economically disadvantaged persons. 15 U.S.C. § 9009c(3)(a). The Small Business Administration ("SBA") initially advised Adia that its application had been approved and that an award would be deposited into its bank account within three to seven business days. But after weeks passed without the disbursement of the grant monies, the SBA notified Adia that—due to several federal court decisions holding that the priority applicant system violated the Fourteenth Amendment's Equal Protection Clause—it could no longer provide Adia with the award it had initially approved.

Adia filed this case as a putative class action on behalf of similarly situated, priority-applicant businesses whose applications were initially approved, but who were subsequently advised that their awards were cancelled. It contends that the SBA's approval of its

grant application gave rise to a contractual obligation on the part of the United States to provide Adia with the grant the SBA approved. The government's failure to do so, Adia claims, was a breach of contract for which it is entitled to damages and other relief.

The government has moved to dismiss Adia's complaint pursuant to RCFC 12(b)(6) for failure to state a claim. For the reasons set forth below, the Court agrees that Adia has failed to allege facts sufficient to establish the existence of a contract between itself and the United States. The government's motion to dismiss Adia's action for breach of contract, ECF No. 7, is therefore **GRANTED**.

## BACKGROUND[1]

**I.      The American Rescue Plan Act of 2021**

As noted, Congress enacted ARPA to provide financial relief to small businesses adversely impacted by the COVID-19 pandemic. See 15 U.S.C. § 9009c. As pertinent to this case, ARPA established the Restaurant Revitalization Fund, to which Congress appropriated $28.6 billion for FY 2021. Id. § 9009c(b)(2)(A).

The entities eligible to receive grants from the Fund included "restaurant[s], food stand[s], food truck[s], food cart[s], caterer[s], . . . bar[s], lounge[s], brewpub[s]" and other like businesses "in which the public or patrons assemble for the primary purpose of being served food or drink." Id. § 9009c(a)(4)(A). Congress excluded from eligibility "State or local government-operated business[es]," entities that owned or operated "more than 20 locations," and "publicly-traded compan[ies]." Id. § 9009c(a)(4)(C).

ARPA tasked the SBA with responsibility for administering the grant program. Id. § 9009c(a)(1). It provided that the SBA "shall award grants to eligible entities in the order in which applications are received." Id. § 9009c(c)(1). It further provided, however, that the SBA was to "prioritize awarding grants to eligible entities . . . controlled by women, . . . veterans . . ., or socially and economically disadvantaged small business concerns" during the first twenty-one days of any application period. Id. § 9009c(c)(3)(A). These entities were required to submit a "self-certification of eligibility for priority" along with their applications. Id. § 9009c(c)(3)(B).

In general, a grant made to an eligible entity was to be "equal to the pandemic-related revenue loss of the eligible entity." Id. § 9009c(c)(5). A grant recipient would be permitted to use the funds awarded for a variety of business-related expenses including, among others, payroll costs, rent payments, utilities, maintenance expenses, supplies, and food and beverage expenses. Id. § 9009c(c)(5)(A)–(K). The Act provided that grant recipients who ceased operations or failed to use the funds awarded "on or before the last day of the covered period," as defined at 15 U.S.C. § 9009c(a)(3), "shall return" the unused funds to the United States Treasury, id. § 9009c(c)(6).

---

[1] The facts set forth in this Opinion are based on the allegations in Adia's amended complaint, which the Court accepts as true for purposes of resolving the government's motion.

**II.     The SBA's Processing of Adia's Priority Application**

The SBA opened its online application portal on May 3, 2021. Am. Compl. ¶¶ 2, 26, ECF No. 6. That same day, Adia applied for a grant as a priority applicant. Id. ¶ 26. Fifteen days later, on May 18, 2021, Adia received an email from the SBA stating that the agency had approved its application, and that it would "process the funding of this award . . . within 3–7 business days." Am. Compl. Ex. 1, ECF No. 6-1. The award amount was $169,820.34. Am. Compl. ¶ 27.

Adia did not in fact receive the approved funds within three to seven business days as it had been promised. In the meantime, by the end of May, three separate federal court rulings held that ARPA's prioritization of the applications of women-owned and minority-owned businesses was unconstitutional. They held that the government could not "allocate limited coronavirus relief funds based on the race [or] sex of the applicants" under the Fourteenth Amendment's Equal Protection Clause. Vitolo v. Guzman, 999 F.3d 353, 356 (6th Cir. 2021); see also Blessed Cajuns LLC v. Guzman, No. 21-cv-677 (N.D. Tex. filed May 28, 2021) (order granting preliminary injunction); Greer's Ranch Café v. Guzman, 540 F. Supp. 3d 638 (N.D. Tex. 2021).

On May 28, 2021, Adia contacted the SBA to inquire about when its grant award would be disbursed. It was informed that the timeline for disbursing funds had been extended to ten to fourteen business days from the notification date. Am. Compl. ¶ 28. But that extended period also passed with no funds distributed. Adia therefore called the SBA, first on June 10, 2021, and then again on June 15. Id. ¶¶ 31–32. Adia alleges that it was "assured" during these calls that if its application had been approved, "then the funds were being held and would be disbursed." Id. ¶ 32.

On June 23, 2021, however, Adia received an email from the SBA stating that "due to recent court rulings, the SBA [would] not be able to disburse [Adia's] Restaurant Revitalization Fund award." Am. Compl. Ex. 3, ECF No. 6-3. The SBA referenced the three lawsuits mentioned above which it said had "led to three court rulings that preclude [the SBA] from disbursing award funds." Id. The email further stated that "[i]f Congress provide[d] SBA with additional money for the [RRF], SBA [would] continue to process [applications] in the order received." Id. One week later, Adia received another email notice that announced the closure of the Restaurant Revitalization Fund. Am. Compl. Ex. 4, ECF No. 6-4.

Adia alleges that—in reliance of the SBA's representations—it spent $223,596.37 for eligible expenses between May 18, 2021 (the date it received notification that its application had been approved) and June 23, 2021 (the date it learned that—because of the court decisions—the SBA would not disburse the approved funds). Am. Compl. ¶ 30. Adia further alleges that after the RRF program closed, it received a $382,100 Economic Injury Disaster Loan from SBA. Id. ¶ 35. Since then, however, Adia has had to shut down its restaurant and "estimates its losses to be at least $500,000." Id. ¶ 36.

**III.    This Action**

On May 1, 2023, Adia filed its first complaint in this matter, seeking damages from the United States based on breach of contract. Compl., ECF No. 1. After the government filed a motion to dismiss on June 30, 2023, ECF No. 5, Adia filed an amended complaint in lieu of a response on July 21, 2023, ECF No. 6.

3

The amended complaint, like the original, includes a single cause of action for breach of contract. In the amended complaint, Adia alleges that it made a contractual "offer" to the United States when it "applied for the RRF grant through the RRF online portal." Id. ¶ 47. It further alleges that the United States "accepted" this "offer" when the SBA stated, via "standard form email notifications," that Adia's application had been approved. Id. ¶ 48.

Adia also alleges that the contract formed when SBA approved its grant application was supported by consideration. Specifically, according to Adia, in exchange for the government's agreement to provide it with grant funds, it agreed to make expenditures in accordance with the RRF program's guidelines. Id. ¶ 49. The purpose of those expenditures, Adia alleges, "was to keep restaurants, bars, and other similar places of business that serve food or drink open or to allow them to reopen for the betterment of America and as a stimulant to the national economy." Id.

Adia contends that the government's failure "to disburse the awarded funds" constituted a breach of contract. Id. ¶ 50. It requests relief for itself and the class in the form of damages for breach of contract. Id. ¶ 55.B. It also seeks an order that the government "is equitably estopped from denying the existence of its contracts with Plaintiff and Class members and from rescinding the amounts awarded but never paid" to them. Am. Compl. ¶ 55.C; see also id. ¶ 6. Further, it requests an award of the costs of this action, including attorney fees and expenses. Id. ¶ 55.D.

On August 3, 2023, the government filed the motion to dismiss that is currently before the Court. Def.'s Second Mot. to Dismiss [hereinafter "Def.'s Mot."], ECF No. 7. Adia filed its response on August 31, 2023, ECF No. 8, and the government filed its reply on October 16, 2023, ECF No. 11. Oral argument was held on the government's motion on March 13, 2024. See Feb. 8, 2024 Order, ECF No. 12.

## DISCUSSION

### I.  RCFC 12(b)(6)

A complaint may be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant[s] do not entitle [them] to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint" and "indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). The Court, however, is not required to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

"To avoid dismissal" under 12(b)(6), "a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable

4

inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)).

## II. The Breach of Contract Claim

As noted, Adia's complaint includes a single cause of action for breach of an implied-in-fact contract. "To prove the existence of a contract with the government," whether express or implied, "a plaintiff must prove four basic elements: (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1364 (Fed. Cir. 2005) (citing Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1346 (Fed. Cir. 2001)); see also Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003). The government contends that Adia's complaint should be dismissed under RCFC 12(b)(6) because it does not allege sufficient facts to prove any one of these four elements. Def.'s Mot. at 6–15.

To establish mutuality of intent to contract, which is "a threshold condition for contract formation," a party must demonstrate an "objective manifestation of voluntary, mutual assent" to enter a binding contract. Anderson v. United States, 344 F.3d 1343, 1353 (Fed. Cir. 2003) (citing Restatement (Second) of Contracts §18 (Am. L. Inst. 1981)). Adia contends that the government's intent to enter a contract with the recipients of RRF grants is objectively manifested in ARPA, the statute that established the RRF and set forth the rules for its implementation. Specifically, it argues that ARPA expressly mandated that the SBA award grants to eligible entities whose applications it approved, and that "the surrounding circumstances, the parties' course of dealing and conduct, and the realities of the transaction further evidence the government's intent to contract." Pl.'s Resp. at 13–14.

Adia's argument lacks merit. It is well established that, "absent some clear indication that a legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465–66 (1985) (quoting Dodge v. Bd. of Educ., 302 U.S. 74, 79 (1937)).[2] For that reason, courts must "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." Id. at 466. Courts must not "lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party." Id. at 467.

"To determine whether a statute gives rise to a contractual obligation, [the Court] must first look to the language of the statute." Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1382 (Fed. Cir. 2019); Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 631 (Fed. Cir. 2012) (same); see also Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1573 (Fed. Cir. 1994)

---

[2] This presumption "is grounded in the elementary proposition that the principal function of the legislature is not to make contracts, but to make laws that establish the policy of the state." Nat'l R.R. Passenger Corp., 470 U.S. at 466. Such "[p]olicies, unlike contracts, are inherently subject to revision and repeal." Id. Therefore, "to construe laws as contracts when the obligation is not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body." Id.

("[S]tatutory language itself [is] the first source of legislative intent."). And, as in any case involving statutory interpretation, the Court may also examine the "circumstances surrounding" the passage of a statute, to determine the meaning of statutory language. Am. Bankers Ass'n, 932 F.3d at 1383 (citing Nat'l R.R. Passenger Corp., 470 U.S. at 468); see also LSI Comput. Sys., Inc. v. U.S. Intern. Trade Comm'n, 832 F.2d 588, 590 (Fed. Cir. 1987) ("In the absence of a 'clearly expressed legislative intent to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive.'" (quoting United States v. James, 478 U.S. 597, 606 (1986))).

In Dodge v. Board of Education, the Supreme Court observed that where a statute "provides for the execution of a written contract," it is "clear" that Congress intended to give rise to a contractual relationship. 302 U.S. at 78. Adia asserts (without any supporting citation) that "Section 5003 authorizes the SBA to enter into grant agreements, and those agreements are contracts." Pl.'s Resp. at 12. But contrary to this assertion, there is nothing in Section 5003 that "provides for the execution of a written contract on behalf of the [United States]" or that even "speak[s] of a contract" with the United States. Nat'l R.R. Passenger Corp., 470 U.S. at 466–67.

For that reason, Adia's reliance on the court of appeals' decision in Columbus Regional Hospital v. United States is misplaced. See Pl.'s Resp. at 7 (citing 990 F.3d 1330, 1338 (Fed. Cir. 2021)). In that case, the Federal Emergency Management Agency ("FEMA") entered a written disaster relief agreement with the State of Indiana. Columbus Reg'l Hosp., 990 F.3d at 1336. The court of appeals ruled that the agreement was a binding contract, citing its prior precedent which held that federal grant agreements constitute contracts "when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." Id. at 1338.

Significantly, in Columbus Regional Hospital, the threshold condition for establishing the existence of a contract—mutual intent to be contractually bound—was reflected in FEMA regulations and the language of the written agreements. As the court of appeals explained, "FEMA regulations describe 'FEMA-State Agreements' as 'impos[ing] binding obligations on FEMA, States, their local governments, and private nonprofit organizations within the States in the form of conditions for assistance which are legally enforceable.'" Id. at 1339 (citing 44 C.F.R. § 206.44(a)). It further observed that the regulation "is incorporated by reference in the FEMA-Indiana agreement, and it is objective evidence of the parties' intent to be bound by the agreement." Id. Here, by contrast, Adia did not execute a grant agreement with the United States, much less one that contained language reflecting an intent to impose binding obligations on the United States.

Adia further contends that Congress's intent to bind the United States in contract can be inferred from the fact that ARPA imposes a variety of mandatory requirements on the SBA through its use of the word "shall." These include, for example, provisions stating that "[t]he Administrator shall use amounts in the Fund to make grants," "shall award grants to eligible entities in the order in which applications are received," and "shall prioritize awarding grants to [the priority applicants]." Pl.'s Resp. at 10 (quoting 15 U.S.C. § 9009c(b)(3), (c)(1), (c)(3)(A)).

But the fact that a statute uses the word "shall" or otherwise imposes mandatory requirements on the government provides no indication in and of itself that Congress intended the obligations imposed to be contractual in nature. For example, in its seminal opinion in Dodge, the Supreme Court held that a state law which provided that Illinois public school

6

teachers "shall be paid [$1,500] annually and for life" beginning on the date of their retirement did not create a contractual obligation that the legislature could not abrogate by subsequent legislation. 302 U.S. at 79–81 (emphasis added). Similarly, in American Bankers Association, the Federal Reserve Act stated that member banks are "required . . . to subscribe to the capital stock" of their regional Reserve Bank and "shall be entitled to receive an annual dividend of six per centum on the paid-in capital stock." 932 F.3d at 1382 (quoting Pub. L. No. 63−43, ch. 6, §§ 2, 7, 38 Stat. 251, 252, 258 (1913)) (emphasis added). The court of appeals nonetheless characterized the statute as "devoid of the traditional indicia of a contractual undertaking." Id.

Nor does the Supreme Court's decision in Maine Community Health Options v. United States, 140 S. Ct. 1308 (2020), support Adia's argument that the use of the word "shall" in ARPA reflects Congress's intent that the government be bound in contract. See Pl.'s Resp. at 10. To be sure, the Supreme Court observed in that case (as it has in many others) that "[t]he first sign that the statute imposed an obligation is its mandatory language: 'shall.'" Pl.'s Resp. at 10 (quoting Maine Cmty. Health Options, 140 S. Ct. at 1320). But the Supreme Court was addressing whether the Affordable Care Act ("ACA") imposed a statutory obligation on the United States to reimburse insurance carriers for certain losses they incurred as a result of their participation in the risk corridors program and, if so, whether that obligation was enforceable notwithstanding that Congress failed to appropriate sufficient funds to satisfy it. Maine Cmty. Health Options, 140 S. Ct. at 1331 (holding that "Congress created a rare money-mandating obligation" under 42 U.S.C. § 18062's "formula"); see also Montana Health Co-Op v. United States, 139 Fed. Cl. 213, 221 (2018) (finding statutory obligation to make cost-sharing payments notwithstanding Congress's failure to appropriate funds); Sanford Health Plan v. United States, 139 Fed. Cl. 701, 709 (2018) (same). And, in light of its conclusion that the government had a statutory obligation to make the risk corridor payments, the Court found it unnecessary to review the court of appeals ruling that the United States had no contractual obligation to do so. Maine Cmty. Health Options, 140 S. Ct. at 1331 n.15.

Because the Supreme Court did not address the issue, the Federal Circuit's holding in Moda Health Plan, Inc. v. United States—that Section 1342 of the ACA did not create a contractual relationship between the United States and insurers participating in the risk corridors program—remains good law. 892 F.3d 1311, 1330 (Fed. Cir. 2018), rev'd on other grounds sub nom. Maine Cmty. Health Options, 140 S. Ct. 1308. In that case, notwithstanding the "shall pay" language in the statute, see 42 U.S.C. § 18062, the court of appeals concluded that there was "no statement by the government [that] evinced an intention to form a contract" and that "[t]he statute, its regulations, and HHS's conduct all simply worked towards crafting an incentive program." Moda Health Plan, Inc., 892 F.3d at 1330. The "overall scheme" of the risk corridors provisions of the ACA, the court of appeals further noted, "lack[ed] the trappings of a contractual arrangement." Id.

Adia also cites Local Initiative Health Authority for L.A. County v. United States, 142 Fed. Cl. 1 (2019), in support of its argument that Congress's intent to bind the United States in contract can be inferred from the mandatory nature of the obligations ARPA imposed on the SBA. Pl.'s Resp. at 9, 11. But that decision does not bind this Court, appears inconsistent with controlling precedent, and, in any event, arose out a statutory program that bears no resemblance to ARPA.

In <u>Local Initiative</u>, the court held that under the Affordable Care Act the government was contractually obligated to pay subsidies to insurers selling health plans on ACA health benefits exchanges where they had provided cost-sharing reduction discounts to enrollees. The court so held based on the "unequivocal promissory language" the statute employed as well as "[t]he surrounding circumstances" which it said "reinforce[d] the existence of a contractual arrangement." <u>Id.</u> at 17. Specifically, the court found that the cost-sharing program the ACA created had the "hallmark" of a "traditional quid pro quo exchange" in that it "offer[ed] specified incentives in return for the voluntary performance of private parties" and was "promissory, providing agency officials administering the program with no discretion in awarding incentives to parties who perform." <u>Id.</u> at 16 (citing <u>Moda Health</u>, 892 F.3d at 1330; <u>Radium Mines, Inc. v. United States</u>, 153 F. Supp. 403, 405–06 (Ct. Cl. 1957)).

According to Adia, the RRF that ARPA established was similar in that it "was a new program" that "incentivized program participants to invest in or restart their businesses in order to pull the country out of a significant economic crisis." Pl.'s Resp. at 14–15. Adia contends that it "'would have struck a profoundly inequitable bargain' . . . if the Government could renege on its promise to pay approved grant recipients amounts equal to their 'pandemic-related revenue[] loss'—the precise motivating factor for entities like Adia to enter into the deal at all." Pl.'s Resp. at 15 (first quoting <u>Nat'l R.R. Passenger Corp</u>, 470 U.S. at 468; and then quoting 15 U.S.C. § 9003c(a)(7)).

Adia's arguments are inconsistent with controlling precedent for several reasons. First of all, as the Supreme Court observed in <u>National Railroad</u>, and as the court of appeals reiterated in <u>American Bankers</u>, "in determining whether a particular statute gives rise to a contractual obligation, 'it is of first importance to examine the language of the statute.'" <u>Nat'l R.R. Passenger Corp</u>, 470 U.S. at 466 (quoting <u>Dodge</u>, 302 U.S. at 78); <u>Am. Bankers Ass'n</u>, 932 F.3d at 1382; <u>see also</u> <u>Moda Health, Inc.</u>, 892 F.3d at 1330 (distinguishing <u>Radium Mines</u>, where the Court of Claims held that the regulatory scheme at issue created contractual obligations because its provisions "made a 'guarantee,' . . . invited uranium dealers to make an 'offer,' and . . . promised to 'offer a form of contract' setting forth 'terms' of acceptance."). Adia, however, has identified no language in the statute at all that speaks in terms of contract.

Second, the "surrounding circumstances" Adia asks the Court to consider are irrelevant to the task at hand, which is to discern whether Congress intended to create contractual obligations when it enacted ARPA. According to Adia, it is appropriate for the Court to consider, among other things, the parties' "course of dealing and conduct," their "legitimate expectations" and "the realities of the transaction," which it says provide "further evidence" of "the government's intent to contract." Pl.'s Resp. at 13; <u>see also id.</u> at 14–15 (contending that "the circumstances surrounding Section 5003's enactment reveal that the expectation of a binding obligation by the Government was critical to making the bargain worthwhile to businesses like Adia" and that "Adia, not the Government, 'would have struck a profoundly inequitable bargain' . . . if the Government could renege on its promise to pay approved grant recipients).

These are not the kinds of "surrounding circumstances" that the Court described in <u>National Railroad</u>. In that case, the circumstances the Court discussed were relevant to what <u>Congress</u> intended when the statute was enacted. These included, for example, that the statute was enacted in the context of prior pervasive regulation of the railroad industry, which the Court observed "belie[d] an intent to contract away governmental powers." <u>Nat'l R.R. Passenger Corp</u>,

8

470 U.S. at 468. It was also in that context that the Court observed in passing that the railroads could have "had no legitimate expectation" that Congress would have contracted away its regulatory authority. Id. at 469.

As the court of appeals has explained, "there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." D & N Bank v. United States, 331 F.3d 1374, 1377 (Fed. Cir. 2003). Even assuming a court could find intent to contract in the absence of any statutory language supporting such intent, the relevant precedent does not contemplate consideration of an open-ended category of factors that do not bear directly on Congress's intentions as "surrounding circumstances" within the meaning of National Railroad.

Finally, even were the Court to follow an approach similar to the one employed in Local Initiative, the relationship that ARPA establishes between the United States and applicants for RRF grants does not bear any of the "hallmarks" of a contractual undertaking or "quid pro quo." 142 Fed. Cl. at 16. ARPA does not require restaurants to provide anything to the government in exchange for the grant monies they receive. The only requirements imposed on grant recipients were that they apply the funds they received to eligible expenses and return unused funds. 15 U.S.C. § 9009c(c)(1), (6). "[A] statute does not create contractual obligations merely by setting forth 'benefits to those who comply with its conditions.'" Am. Bankers Ass'n, 932 F.3d at 1383 (quoting Wisc. & Mich. Ry. Co. v. Powers, 191 U.S. 379, 387 (1903)). And "the mere fact that [recipients] must comply with certain requirements as a condition of a grant does not mean that the United States has somehow manifested its intent to contract." Imaginarium, LLC v. United States, 166 Fed. Cl. 234, 244 (2023); see also Harlem Globetrotters Int'l, Inc. v. United States, 168 Fed. Cl. 31, 38 (2023) (same).

In short, Adia has failed to identify any "clear indication" in the statutory language that Congress intended to bind the United States contractually when it created the RRF. Its argument regarding the consideration of "surrounding circumstances" is inconsistent with binding precedent. For these reasons, it has failed to allege sufficient facts to support its breach of contract claim.[3]

## III.    Equitable Estoppel

In the "prayer for relief" section of Adia's amended complaint, it asks the Court to enter an order directing that the government be "equitably estopped" from denying the existence of a contract between itself and the SBA. Am. Compl. ¶ 55.C; see also id. ¶ 6. But while equitable estoppel can prevent a party from denying the existence of a contract, "it cannot be used to create a contract that otherwise would not exist." Llamera v. United States, 15 Cl. Ct. 593, 600 (1988); see also Lawndale Restoration P'ship ex rel. Boulevard Realty Servs. Corp. v. United States, 95 Fed. Cl. 498, 507 (2010) (Equitable estoppel "is a defensive doctrine, not the basis of a cause of action."); Gregory v. United States, 37 Fed. Cl. 388, 396 (1997) (holding that equitable estoppel cannot "establish the existence of a contract"); New Am. Shipbuilders, Inc. v. United States, 15

---

[3] Given the Court's ruling that Adia has not alleged sufficient facts to establish mutuality of intent to contract, the Court finds it unnecessary to address whether it has done so with respect to the other elements of a valid contract: offer, acceptance, consideration, and authority to contract.

Cl. Ct. 141, 144 (1988) ("In this case, as there was no contract, equitable estoppel is inapplicable."); Pac. Gas & Elec. Co. v. United States, 3 Cl. Ct. 329, 340 (1983) ("No contract exists in this case upon which to invoke the doctrine of equitable estoppel."). For this reason, Adia conceded at oral argument that—if the Court were to reject its argument that an implied-in-fact contract existed between Adia and the United States—it would be unnecessary to address its equitable estoppel arguments.

The Court notes that it is the doctrine of "promissory estoppel" that may supply a cause of action by which "one who 'reasonably relies on another's promise can subsequently require [him] to make good on [that] promise.'" XP Vehicles, Inc. v. United States, 121 Fed. Cl. 770, 784 (quoting Carter v. United States, 98 Fed. Cl. 632, 638 (2011)). Although the allegations in its amended complaint certainly give the appearance of asserting the elements of promissory estoppel, Am. Compl. ¶ 6, Adia has disavowed any intention to pursue a cause of action based on that doctrine, Pl.'s Resp. at 26, which would, in any event, be outside of the Court's jurisdiction, Piotrowski v. United States, 722 Fed. App'x 982, 985 n.1 (Fed. Cir. 2018) (citing Sinclair v. United States, 56 Fed. Cl. 270, 281 (2003)); see also XP Vehicles, Inc., 121 Fed. Cl. at 782–83 (collecting cases holding that claims based on contracts implied in law (like those based on promissory estoppel) are outside of this Court's jurisdiction).

In short, given that equitable estoppel cannot be invoked in the absence of a contract, and given that the Court has held that there was no contract between Adia and the United States, there exists no basis for the invocation of the doctrine of equitable estoppel in this case.

## CONCLUSION

For the foregoing reasons, the government's second motion to dismiss, ECF No. 7, is **GRANTED**, and Adia Holdings, Inc.'s amended complaint, ECF No. 6, is **DISMISSED with prejudice**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge